No. 32,190

Carl T. Reece, a Minor, by His Next Friend, C. E. Reese, *Appellant*, v. C. B. Wrightsman et al., as Trustees of The Standard Oil Company of Kansas, a Dissolved Corporation, and The Standard Oil Company of Indiana, *Appellees*.

(46 P. 2d 620)

filed July 6, 1935.   Opinion

*Charles Stephens*, of Columbus, *C. S. Denison* and *C. O. Pingry*, both of Pittsburg, for the appellant.

*R. R. Vermilion*, *Earle W. Evans*, *Joseph G. Carey*, *W. F. Lilleston*, *George C. Spradling*, *Henry V. Gott*, all of Wichita, and *Dallas W. Knapp*, of Coffeyville, for the appellees.

The opinion of the court was delivered by

Burch, J.: The action was one by a minor, by his next friend, for damages for personal injuries sustained when plaintiff set fire to his clothing, on which gasoline had been spilled which had escaped from an oil refinery. A demurrer to plaintiff's evidence was sustained, and he appeals.

The Standard Oil Company of Kansas owned and operated an oil refinery at the city of Neodesha. The corporation was dissolved, and for the purpose of winding up its affairs, its business and property vested in its trustees. They transferred to the Standard Oil

Company of Indiana. The accident which occasioned the litigation happened while succession of one corporation to the other was in progress of consummation. The Kansas corporation, its trustees, and the Indiana corporation, were made defendants. For convenience, the corporations will be referred to indifferently as "the oil company."

The refinery occupied approximately 200 acres of land adjoining the city. Underground pipe lines forming part of the plant, of which there were many, would deteriorate and leak. From twenty to twenty-two feet below the land surface is a stratum of gravel in which water is found. Gasoline which escaped from pipes would reach this formation and appear on top of the water in wells in the city in the vicinity of the refinery. One enterprising citizen drilled three wells on his lots to the gravel with a post auger, and from the wells he pumped and sold large quantities of gasoline and kept the money. Corrective measures adopted by the oil company reduced the supply, and operation of the wells as gasoline wells became unprofitable and was discontinued. The oil company pumped some wells on private property, and recovered some gasoline, which was returned to the refinery. There was indefinite testimony regarding one lawsuit growing out of the pumping of gasoline by the oil company from a lot owner's well, which was compromised in some way. There was testimony of one notification to the oil company regarding gasoline in a well, given some ten or twelve years before the trial, and there was testimony that some complaints of oil in wells were made in 1913 and 1914. There was no testimony that use of any specified water well, as such, was abandoned because of gasoline in it, and use of city water seems to have superseded use of well water without protest, as far as the evidence disclosed, by property owners. The refinery had been in existence thirty-six years at the time of the trial. There was no evidence that any fire or any explosion of gasoline or other petroleum product had ever occurred as a result of escape of gasoline, and there was no evidence of specific hurt or annoyance in recent years, either to the public generally, or to individuals, as the result of escape of gasoline from the refinery premises.

When the accident occurred, several wells in the vicinity of the refinery had gasoline in them. Shortly before the trial, one witness drew some gasoline from his well to kill potato bugs, and gasoline drawn from wells was used to operate automobiles.

Wayne. Ramey leased city lots approximately a block from the boundary of the oil company's land, which he occupied with his sister and his son, Wayne. There was a well north and west of the house which contained gasoline. The well was two and one half to three feet in diameter, and twenty-three to twenty-five feet in depth to the gasoline. The well was walled with stone and brick, and was kept covered with boards. Ramey used gasoline from the well to operate his automobile. A supply taken from the well was filtered and kept for ready use in a barrel at the back of the lot, about forty feet from the well.

On the afternoon of October 15, 1932, Ramey came home in his automobile, and told his son he needed some gasoline in the automobile. Plaintiff, Carl Reece, was at the Ramey home visiting the boy, Wayne, and volunteered to help Wayne. Perhaps the two boys had been engaged in replenishing the supply in the barrel when the elder Ramey arrived. The boys took eight gallons of gasoline from the barrel and filled the tank of the automobile. The elder Ramey then drove away. The two boys then either resumed or commenced the task of putting gasoline in the barrel. The method of operation was this: The covering having been removed from the well, Wayne would draw up gasoline from the well by means of a bucket and rope. The fluid would be filtered through chamois skin, held by Carl, into a gallon glass jar; the jar would be emptied into a five-gallon milk can; when the milk can was nearly full, it would be carried to the barrel, and the contents would be emptied into the barrel. When the automobile tank was filled, the barrel was tipped, gasoline was poured into a bucket, the bucket was carried to the automobile, and the contents of the bucket were poured into the tank through a large funnel.

At some time, in the handling of the gasoline, some of it was sprinkled or spilled on Carl's right trouser leg. Before leaving, the elder Ramey warned Carl to be careful about gasoline, and told Carl it was exceedingly dangerous to have matches. After the elder Ramey went away, Carl found a match in his pocket. In order to get rid of the match Carl went some fifteen feet from the milk can and struck the match on a rock. His trouser leg took fire, and he was severely burned.

At the time of the accident Carl was twelve years and nearly four months old. He was a bright, intelligent boy, who understood things. Wayne Ramey was some years older. Carl knew he was handling gasoline, and knew it would burn, but did not know it

was so explosive, and did not know it could be set on fire without flame coming in contact with the fluid.

Gasoline is a fluid in common use by all classes of persons, and is in common use in home for various domestic purposes. The number of gallons consumed daily reaches astronomical figures. To supply this need, gasoline may be safely stored in quantity and safely distributed as required. While it is a dangerous substance, because of its inflammable and explosive character, peril lies only in the manner in which it is kept and handled. Nuisance is a condition, and so far as disclosed by the evidence, after years of experience, the gasoline which escaped from the oil company's pipes and percolated to the water table of the neighborhood, was not in fact either a public or private nuisance on account of its inflammable and explosive character. The result is, plaintiff may not recover on the strength of an opprobrius name. He can recover only for breach of duty to him, or to the class to which he belonged—inexperienced boys—to keep the fluid in such a manner foreseeable personal injury by fire would not occur. Manifestly the oil company did that. The gasoline was inaccessible to boys manifesting normal boyish proclivities. Even Ramey, who impounded a quantity of the wandering fluid at the bottom of a deep, walled and covered well, was not guilty of maintaining a nuisance, and was not even guilty of negligence.

The oil company might foresee that escaped gasoline would spoil the water of wells in the vicinity of the refinery, but that is not the type of harm involved, and danger of personal injury by fire from the gasoline, as the oil company left it, was not within the range of reasonable foresight.

Under the circumstances which have been narrated, the oil company might foresee that an occupant of land in the vicinity of the refinery, whose well contained gasoline, would exercise the dominion of an owner and would appropriate the fluid to uses to which it was adapted, as Ramey did. But there was no notice that the practice was resulting in or threatening personal injury to anybody, and that appropriation would expose boys at large in the city to the hazard of fire was no more to be foreseen than if the oil company had sold to Ramey a can, or a drum of gasoline, or a larger quantity delivered in his underground tank. Manifestly distributors of gasoline are not responsible for the manner in which it is subsequently kept and used, unless it is disposed of to a person known to be unfit to handle it.

The circumstances under which the accident did happen were quite peculiar. After he had been warned concerning matches, Carl discovered a match in his pocket. He concluded he would get rid of it. He went away from the place where ignition of gasoline might be expected to occur, to strike his match. While he gave a remarkably clear and detailed narrative of the events of the afternoon at the Ramey home, he could not account for the gasoline on his clothing; and it so happened Carl himself unwittingly carried away to a place remote from the normal place of danger the gasoline which he himself unwittingly set on fire.

It was not essential that the oil company should foresee that injury would occur in the precise manner in which it did occur, but risk that a boy would somehow be burned was not a normal risk attending accumulation of gasoline in Ramey's well. The result is, the oil company was not negligent with respect to plaintiff. This conclusion renders it unnecessary to discuss the subject of legal cause.

Plaintiff cites and relies on the case of *Clark v. Powder Co.*, 94 Kan. 268, 146 Pac. 320. The case is not in point. In that case the agent of a powder company, engaged in manufacture of high explosives and in the business of shooting oil wells, shot an oil well with solidified glycerine. The work completed, the agent left a quart of the explosive at the well. A son of the owner of the land on which the well was shot found the explosive, and fearing injury to himself, took it away and partially concealed it in a crevice in a stone fence surrounding an abandoned burial place remote from any habitation. Some boys found the explosive. One of them struck the article with a rock to break it up, and was severely injured. A judgment for damages against the powder company was affirmed by this court. The grounds of the decision, which was sound, both on reason and authority, were fully stated in the opinion by Mr. Justice Dawson. We have no such case here. The solidified glycerine was a substance which was not in daily use by the public generally. It could not be handled at all with safety except by experts, and a quantity of the substance was left at a place where it was inevitable it would be found and handled by persons not qualified to do so. Gasoline is not in the class with the various kinds of dynamite, and in this instance the oil company emphatically did not leave the gasoline exposed to intermeddling by incompetents.

Plaintiff cites and relies on the case of *Snyder v. Light Co.*, 98 Kan. 157, 157 Pac. 442. The case is not in point. In that case the light company maintained an uninsulated high-voltage wire in a city street. A woman discovered a boy fifteen years old sitting on the stone coping of the yard in front of plaintiff's house. The boy was dead and his clothes were on fire. The woman screamed and called for help, and plaintiff rushed out of her house to aid the boy. When she touched the boy she was severely shocked and burned. She recovered a judgment for damages against the light company, and the judgment was affirmed by this court. The boy had tied a rock to the end of a small silk-wound wire, and had thrown the rock over the uninsulated high-voltage wire. There is no similarity between the conduct of the light company in that case and the conduct of the oil company in this case.

This case is not in the same category with the gas-explosion cases. In those cases the explosive substance is disseminated by means of defective appliances in places where contact with fire is likely to occur, and one of the risks is conduct of some grown-up with a child's I. Q., who, when he smells gas, strikes a match to find the place of escape.

In this case, no matter how the gasoline escaped from the refinery, it accumulated and was confined in a place which was not attractive to boys, and was not the customary scene of boyish activities. The place of confinement was one where contact with fire, whether of boyish origin or otherwise, was neither natural nor probable. Nothing the oil company did portended personal injury to anybody through contact of the gasoline, or gasoline vapor, with fire.

The gasoline was taken from the perfectly safe place in which the oil company kept it, was safely brought to the surface, was there safely handled, so far as proximity to fire was concerned, and nothing which Ramey did portended personal injury to anybody through contact of the gasoline, or gasoline vapor, with fire.

Looking forward from the standpoint of the oil company, when it suffered escaped gasoline to accumulate in Ramey's well, and looking backward through the series of events ending in injury to plaintiff, risk of harm to plaintiff or any one of his class, from the inflammable character of gasoline, as it was maintained, was altogether too conjectural to form the basis of a charge of negligence against the oil company.

The demurrer to plaintiff's evidence was properly sustained, and the judgment of the district court is affirmed.